# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert Webb, | No. 23-cv-1836 (KMM/TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| City of Minneapolis; Officer Luke Bakken; Officer Robert Calhoun; Officer Tser Cheng; Officer Christopher Lange, in their individual and official capacities; | |
| Defendants. | |

Plaintiff Robert Webb alleges that several City of Minneapolis Police Officers violated his Fourth Amendment right to be free from unreasonable searches and seizures and committed common law torts when he was arrested on August 22, 2021. He also asserts that Defendants violated the Minnesota Government Data Practices Act ("MGDPA") in connection with public records requests he submitted concerning the August 22, 2021 incident. This matter is before the Court on the Defendants'[1] Motion for Judgment on the Pleadings. As explained below, the Court grants the motion in part and denies it in part.

---

[1] The City of Minneapolis, Officer Tser Cheng, and Officer Christopher Lange bring the motion for judgment on the pleadings. Officer Luke Bakken is deceased and the City requested that Plaintiff voluntarily dismiss him from the suit. The City represents that there is no Minneapolis Police Officer named Robert Calhoun, and the correct officer has not been named or served. Defs.' Mem. 2 n.1, Doc. 26. Instead of Robert Calhoun, Defendants refer to the fourth officer involved in this incident as "Ryan Calhoun." *Id.* at 2.

## BACKGROUND[2]

### *Mr. Webb's Arrest*

On August 22, 2021, Plaintiff Robert Webb was on work release from a state prison, living at Portland House, a halfway house in Minneapolis. Compl. ¶ 7 (Doc. 1). Mr. Webb was staying there along with approximately twelve to fifteen other individuals. *Id.* Mr. Webb is a Black man, as were all the other Portland House residents at that time. *Id.* Webb lived in a room above the main floor, and others lived on the lower level beneath the main floor. *Id.* At approximately 2:30 a.m., Minneapolis Police Officers Luke Bakken, Ryan Calhoun, Tser Cheng, and Christopher Lange arrived at Portland House to execute arrest warrants for two of the residents, Deondre Jefferson and Darryl Billups. *Id.* ¶ 8. The officers had no warrant to arrest Mr. Webb.

A staff member of the halfway house, M.P., witnessed portions of the events that form the basis of Webb's claims. *Id.* ¶ 18. At approximately 2:39 a.m., Officers Bakken and Calhoun met with M.P outside of the halfway house. Ans., Ex. E ("Calhoun BWC") 6:00, Doc. 9-5; *id.*, Ex. D ("Bakken BWC") 6:20, Doc. 9-4. M.P. told Officers Bakken and Calhoun that Mr. Billups and Mr. Jefferson had been walking around the residence rather

---

[2] This background includes factual allegations in the complaint as well as the Court's description of the relevant events that are established by the video footage attached to the Defendants' answer and referenced throughout their briefing in support of the pending motion. Courts regularly consider such video footage as "embraced by the pleadings" in this context. *E.g.*, *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021); *Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023); *Anderson v. St. Luke's Hospital*, No. 19-cv-106 (MJD/LIB), 2019 WL 7882118, at *3 n.5 (D. Minn. Nov. 19, 2019), *R&R adopted,* No. 19-cv-106 (MJD/LIB), 2020 WL 256176 (D. Minn. Jan. 17, 2020); *Verino v. Higgins*, No. 19-cv-3024 (DWF/LIB), 2020 WL 3542757, at *1 n.1 (D. Minn. June 30, 2020). The Court finds that it can consider these videos without converting the Defendants' motion to a motion for summary judgment. Plaintiff does not argue otherwise, and in fact, cites portions of the footage in his opposition.

than in their room, in violation of Portland House's rules. M.P. explained that Billups and Jefferson remained inside the residence. Calhoun BWC 6:10–7:00, 9:00–10:00; Bakken BWC 6:20–7:00. The officers asked M.P. to stay outside while they went into the halfway house to arrest Billups and Jefferson. Calhoun BWC 8:45–9:00, 12:50–13:10. They told M.P. if he went back into the house, to not discuss the officers' plans to make the arrests. Calhoun BWC 8:50–9:15; Bakken BWC 8:50–9:15. M.P told the officers again that Mr. Billups and Mr. Jefferson were in the residence thirty minutes earlier. Calhoun BWC 9:00–9:30; Bakken BWC 9:15–9:30. Officer Calhoun then called dispatch to request another squad car come to the residence to help Officers Bakken and Calhoun execute the warrants. Calhoun BWC 10:00–10:20.

Officers Cheng and Lange arrived at the halfway house around 2:45 a.m. and met with Officers Bakken and Calhoun. Calhoun BWC 13:40–13:44. The newly arrived officers learned that Mr. Billups and Mr. Jefferson had felony warrants, including a warrant for assault, and that both warrants cautioned about the presence of weapons. Calhoun BWC 13:45–14:30; Bakken BWC 13:45–14:30. Officer Bakken told the other officers that while standing on the sidewalk in front of the residence, he had seen people moving around inside, and M.P. confirmed that Billups and Jefferson were not in their rooms. Bakken BWC 14:00–15:10.

M.P. did not provide the officers with a detailed description of Billups and Jefferson. For example, he did not know what they were wearing. Calhoun BWC 16:40–16:44; Bakken BWC 16:38–16:45. M.P. stated that "both have braids, or like dreads, but Darryl [Billups] has like, color on one side, like gold color on one side of his braids." Calhoun

3

BWC 16:45–17:05; Bakken BWC 16:24–17:05. M.P. provided the officers with a key to the room Billups and Jefferson occupied in the residence, in case they needed to use it. Calhoun BWC 17:05–17:15.

At about 2:51 a.m., the officers entered the residence to execute the warrants. Calhoun BWC 17:30; Bakken BWC 17:30. As they did so, the officers unholstered their weapons. Calhoun BWC 17:30–17:39; Bakken BWC 17:30–18:00; Ans., Ex. C ("Cheng BWC") 5:40–45, Doc. 9-3. Soon after entering the residence, Officer Cheng and Officer Lange saw a man standing in a hallway on the main level. Officer Cheng pointed his firearm at the man and asked for his name. Cheng BWC 6:10–6:25; Bakken BWC 18:00–18:15. The man identified himself as Deondre—Mr. Jefferson's first name—and the officers arrested him. Cheng BWC 6:10–6:25; Bakken BWC 18:15–18:25. Officer Calhoun led Mr. Jefferson to the front door of the residence while Officers Cheng and Lange continued to go through the house looking for Mr. Billups. Calhoun BWC 18:36–18:50; Cheng BWC 6:50–6:55. Officer Calhoun asked Mr. Jefferson "where's Darryl at?" and Jefferson indicated that he didn't know where Darryl was. Calhoun BWC 18:50–18:55.

Around 2:50 a.m., Mr. Webb woke up and left his room to get some water and use the restroom. Compl. ¶ 11. While searching the house, Officer Cheng passed an open bathroom door, which at first appeared unoccupied. Cheng BWC 6:44–7:00. Officer Lange was behind Officer Cheng carrying a "less-lethal" 40mm projectile launcher. Cheng BWC 6:40–7:00. Officer Cheng took a closer look as he was passing the open restroom door, turned to his left, and spotted someone standing in a darkened alcove of the bathroom. Cheng BWC 7:00–7:03. They later identified this individual as Mr. Webb.

4

The Officers pointed their weapons at Mr. Webb, told him to show his hands and face the wall. Webb perceived the weapons to be a shotgun and a handgun, and he was frightened. Cheng BWC 7:00–7:15; Compl. ¶ 11. The officers handcuffed Mr. Webb and told him he was under arrest on a warrant. Cheng BWC 7:15–7:30. They did not ask Webb to identify himself. Officers Cheng and Lange then led Mr. Webb outside the residence where Officer Calhoun was waiting with Mr. Jefferson. Cheng BWC 7:30–8:00. Officer Cheng helped Mr. Webb make a phone call on Webb's cell phone. Cheng BWC 8:40–10:10.

When Officers Cheng and Lange brought Mr. Webb outside the residence, M.P. was near the front steps. Cheng BWC 8:00–8:07. Officer Lange asked if the two men they had arrested were Mr. Billups and Mr. Jefferson. Ans., Ex. B ("Lange BWC") 8:15–8:20, Doc. 9-2. M.P. responded, asking "Is that the guy with the color on one side of his head? That should be Darryl right there." Lange BWC 8:20–8:30. He pointed at Mr. Webb as he said this. Lange BWC 8:20–8:30. Officer Lange then shined a flashlight on Mr. Webb's face to help M.P. identify him. Lange BWC 8:20–8:30. Officer Lange asked "So that's both of them, correct?" and M.P. agreed. Lange BWC 8:30–8:32. Officer Bakken asked

again "Both of them? Both of them guys?" Again, M.P. agreed, saying "Yep."[3] Bakken BWC 20:20–20:25.

Mr. Webb had his identification card in his pocket. Compl. ¶¶ 12–13. The arresting officers searched Mr. Webb and placed his belongings, including his ID, in a manila folder without looking at it first. Bakken BWC 24:20–24:25. Officer Calhoun then placed Webb in the back of a squad car and handed Officer Bakken the manila envelope. Bakken BWC 24:20–24:25. Officer Bakken opened the rear door of another police vehicle to place the manila envelope in the back, but before doing so, he looked briefly at Mr. Webb's ID. Bakken BWC 24:25–24:35. Officer Bakken placed the envelope in the back of the squad car. Bakken BWC 24:35–25:02.

A short time later, Officer Bakken retrieved the envelope and Webb's ID. He gave the ID to Officer Calhoun. Bakken BWC 25:30–26:00. Officer Calhoun saw that the name on Mr. Webb's ID, Robert Webb, did not match the name on the warrant and asked Plaintiff, "Who's Robert Webb?" Calhoun BWC 26:00–26:13. Mr. Webb asked Officer Calhoun if that was a real question and Officer Calhoun again asked "Who's Robert Webb?" Ans., Ex. F ("Squad Video Forward") 4:00–4:28, Doc. 9-6. Mr. Webb told him

---

[3] In the complaint, Mr. Webb asserts that M.P. told the officers "You have the wrong guy," and the officers ignored him. Compl. ¶ 19. The Court has reviewed the video footage provided in support of Defendants' motion and M.P. does not tell the officers they arrested the wrong person. In fact, the video captures M.P. confirming that the officers had arrested both men they asked him about before entering the residence. Plaintiff does not suggest that the officers' bodycams are incomplete. Because the allegation is inconsistent with the video, the Court declines to accept the complaint's allegation in Paragraph 19 as true for purposes of ruling on the pending motion for judgment on the pleadings. *See Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (explaining that a court need not "adopt the plaintiff's version of the facts if they are blatantly contradicted by video evidence") (cleaned up).

"that's a hard question" and then said he had been "known, doing business as Robert Webb." Squad Video Forward 4:28–4:40. Officer Calhoun asked, "What?" and Mr. Webb again said "I do business as Robert Webb." Squad Video Forward 4:40–4:44. Still believing he was speaking to Darryl Billups, Officer Calhoun asked "So you're using a false name?" Mr. Webb denied that he was. Squad Video Forward 4:44–4:48. Officer Calhoun asked Mr. Webb what he meant by saying that he does business as Robert Webb, and Plaintiff told him "I'm not trying to be difficult with you. Look at the ID and look at me." Squad Video Forward 4:48–5:00. In response, Officer Calhoun said, "Well, you have his ID, man, so I'm asking you, who's Robert Webb?" After a brief silence, Officer Calhoun stated, "Alright, well you both are under arrest, okay? Okay?" To this, Mr. Webb responded: "Yeah." Squad Video Forward 5:00–5:13.

Around nine minutes later, while Officer Calhoun was looking up the warrant information on his squad computer, he began discussing the warrants with Mr. Webb and Mr. Jefferson, and addressed them with the name "Darryl." Bakken BWC 35:00–35:40. In response, Mr. Jefferson said there was no one named "Darryl" in the back of the car. Bakken BWC 35:40–35:53. When Officer Calhoun asked Jefferson if his name was Darryl, Jefferson said "No, my name's Deondre." Bakken BWC 35:53–35:56. Officer Calhoun then asked Mr. Webb, "What's your name?" to which Webb responded "Rob." Officer Calhoun asked "What?" and again Mr. Webb said "Rob. You have my ID." Bakken BWC 35:55–36:05.

This exchange occurred just after 3:09 a.m., and the officers initially arrested Mr. Webb approximately seventeen minutes earlier at 2:52 a.m. The officers had driven a

short distance from Portland House with Mr. Webb and Mr. Jefferson in the rear seat of the vehicle. The officers told Mr. Webb that they were looking for Darryl Billups and that M.P. had identified him as Mr. Billups. Bakken BWC 36:05–36:40. They explained they were checking on Mr. Webb's ID through their squad computer and looking at the warrant so they could verify his identity before taking him all the way to a jail. Bakken BWC 36:40–36:52. As he checked Mr. Webb's ID on the computer, Officer Calhoun asked why Mr. Webb had not answered more clearly when he asked him earlier "who's Robert Webb." Mr. Webb said that because they had his ID and he obviously looked like the person in the photograph on it, he was unsure whether Officer Calhoun had asked him a "real question." Mr. Webb said he thought the officers might have been joking. Bakken BWC 37:25–37:50. At that point, Officer Calhoun said "Well, Robert's going to be going back to the house," and made it clear to Mr. Webb they were taking him back home. Bakken BWC 37:50–38:00.

Officers Bakken and Calhoun drove back to Portland House to look for Mr. Billups and release Mr. Webb at his home. Bakken BWC 38:00–41:30. It was 3:15 a.m. when they arrived, about twenty-three minutes after Mr. Webb's arrest. Bakken BWC 41:30. Before exiting the vehicle, the officers explained that they were going back into the residence, but that they would "be quick." Bakken BWC 41:25–41:35. At the door, Officers Calhoun and Bakken told M.P. that the person they had arrested was not Darryl Billups but Mr. Webb. M.P. said, "Oh, that was Robert Webb?" and apologized to the officers for the confusion. Bakken BWC 42:54–43:20. Officers Calhoun and Bakken went inside Portland House and searched Mr. Billups' room to see if he was still there. He was not. The officers then

8

returned to the squad car and released Mr. Webb. This occurred approximately twenty-eight minutes after his arrest. Bakken BWC 46:00–46:30. After returning Mr. Webb's belongings to him, one of the officers apologized to Mr. Webb. Bakken BWC 46:30–47:13.

A photograph of Mr. Billups that would have been available to the officers shows that he and Mr. Webb differ in appearance. Compl. ¶ 16. Mr. Webb has a darker complexion, stands over six feet tall, and weighs 270 pounds. Compl. ¶ 16; Riach Decl., Ex. D, Doc. 43-4. The information the officers had available to them regarding the warrant for Mr. Billups' arrest indicated that he was 5'10" tall and weighed 224 pounds. Other records indicated that at some point he may have weighed as little as 164 pounds.[4] Ans., Ex. A at 5, 7; *see also* Riach Decl., Ex. A at 5 (listing Mr. Billups as 5'10" tall and weighing 214 pounds), Doc. 43-1.

---

[4] Unlike video evidence, when ruling on a motion for judgment on the pleadings, courts should not accept as true officers' statements in narrative reports that contradict the complaint. *LeMay*, 18 F.4th at 289. Accordingly, the Court disregards the portions of the incident reports submitted by Defendants as Exhibit A to their Answer that contain the officers' narrative accounts. However, Exhibit A also contains call details regarding the warrants and the subjects of those warrants, including identifying information for both Mr. Billups and Mr. Jefferson. These portions of the reports include their age, sex, race, height, and weight, among other details. Ans., Ex. A at 7–8, 11–13. Notably, the Complaint alleges that Officers Calhoun and Bakken arrived at Portland House to execute arrest warrants for both Jefferson and Billups. Compl. ¶¶ 8, 16. And the video evidence supports the inference that, prior to arriving at Portland House, Officer Calhoun, Officer Bakken, or both, had reviewed such information. *See Crow v. Rasmussen*, No. 23-cv-2403 (KMM/TNL), 2024 WL 2014211, at *3–4 (D. Minn. May 7, 2024) (on a motion for judgment on the pleadings, considering exhibit containing warrant information regarding a suspect because it was neither "extraneous to [n]or contradict[ed] the Complaint" and the video evidence supported the reasonable inference that officers saw it before encountering the plaintiff). Mr. Webb does not argue that the Court should disregard this material, and he cites to information about Billups's height and weight contained in Exhibit A in his response. Pl.'s Opp'n at 4 (citing Doc. No. 9-1 at 5).

*Plaintiff's Claims*

Mr. Webb alleges that he was shaken by the incident, has had trouble sleeping, and had "nightmares about guns being pointed at him and other frightening images." Compl. ¶ 21; *see also id.* ¶ 33 (discussing psychological harm). He presents his claims as five separate counts, three of which are relevant here. In Count 1, pursuant to 42 U.S.C. § 1983, Mr. Webb asserts that the individual Defendants violated his right to remain free from unreasonable seizure, false arrest, and excessive force under the Fourth Amendment. He emphasizes that the Defendants handcuffed, arrested, and held him without probable cause or legal justification. Compl. ¶ 35. In Count 2, Webb also brings Fourth Amendment unreasonable-seizure and false-arrest claims against the City of Minneapolis pursuant to § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Count 2 asserts that the City developed constitutionally deficient training practices regarding the execution of arrest warrants and identification of subjects of the warrants. Compl. ¶¶ 37–40. Count 3 asserts state law tort claims for false arrest and false imprisonment against all Defendants. *Id.* ¶¶ 41–44. Counts 4 and 5[5] both allege violations of the MGDPA by failing to provide access to requested government data.

## DISCUSSION

Defendants ask the Court to grant judgment on the pleadings in their favor because the officers made a reasonable mistake of fact when they arrested Mr. Webb. They further

---

[5] The complaint contains two separate counts asserting violations of the MGDPA, both of which are labeled "Count 5," presumably mistakenly. Defendants do not address these claims in their motion to dismiss, but because the Court concludes that the state claims should be dismissed pursuant to 28 U.S.C. § 1367(c), the Court does not address them in detail.

contend that Mr. Webb fails to state any claim for excessive force; that the individual officers are entitled to qualified immunity; that Mr. Webb has inadequately alleged his *Monell* claim against the City; and finally, that they are entitled to official immunity on the supplemental state law claims for false arrest and false imprisonment. For the reasons that follow, the Defendants' motion is granted in part and denied in part.

## I.   Legal Standards

### A.  Motion for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The distinction between a Rule 12(c) motion and a 12(b)(6) motion is "purely formal." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quotation omitted). The facts alleged in the complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, the court takes all factual allegations in the complaint as true and construes all reasonable inferences therefrom in favor of the plaintiff. *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019). However, the court does not take as true

wholly conclusory allegations or the legal arguments offered by the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

**B.  Section 1983 Fourth Amendment Claims**

To plead a § 1983 action, a plaintiff must allege that a person acting under color of state law violated his or her constitutional rights. 42 U.S.C. § 1983; *Iqbal*, 556 U.S. at 676. However, government officials have qualified immunity from § 1983 claims. As a result, plaintiffs must allege that the defendant engaged in conduct that violated a constitutional right and that, at the time of the alleged violation, the right was clearly established. *E.g.*, *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023).

The Fourth Amendment prohibits law enforcement from effecting unreasonable seizures. U.S. Const. amend. IV. Through it, the constitution protects individuals from law enforcement arresting them without cause and using excessive force.

"The Fourth Amendment right of citizens not to be arrested without probable cause is clearly established." *Hill v. Scott*, 349 F.3d 1068, 1072 (8th Cir. 2003). A plaintiff must allege facts showing that the defendant lacked probable cause to arrest him and that reasonable officers would have known that the defendant's conduct violated the Fourth Amendment. *See id.* Where officers have a "facially valid warrant" to make an arrest, but they mistake the arrestee for the person named in the warrant, they do not violate the Fourth Amendment if the mistake was reasonable. *Id.*; *Peterson v. City of Pine River*, 36 F. Supp. 3d 843, 849 (D. Minn. 2014) (citing *Hill*, 349 F.3d at 1072); *see also Hill v. California*, 401 U.S. 797, 802 (1971) (explaining that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the

arrest of the second party is a valid arrest"); *Baker v. McCollan*, 443 U.S. 137, 143–45

(1979) (explaining that there is generally no Fourth Amendment violation when a person

is mistakenly detained pursuant to a valid warrant for another individual).[6] Whether an

officer's mistake is reasonable depends on the "'totality of the circumstances' at the time

of the arrest; 'hindsight is not the standard.'" *Peterson*, 36 F. Supp. 3d at 850 (quoting *Hill

v. Scott*, 349 F.3d at 1073). The innocence of the person who has been seized does not

suffice to allege a constitutional violation. *McCollan*, 443 U.S. at 145. A plaintiff cannot

adequately allege a constitutional violation by claiming that the arresting officer acted

negligently. *See Lane v. Sarpy Cnty.*, 165 F.3d 623, 624 (8th Cir. 1999); *Young v. City of

Little Rock*, 249 F.3d 730, 734 (8th Cir. 2001).

Reasonableness is also the governing standard for assessing excessive-force claims.

*Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). "An officer's use of force violates

the Fourth Amendment if it was 'objectively unreasonable.'" *Pollreis v. Marzolf*, 9 F.4th

737, 747 (8th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–96 (1989)).

Objective reasonableness is assessed "from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Bishop v.

Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (same). Reasonableness is based on the factual

circumstances of each case, including "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers" and whether he is actively

---

[6] *See also Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014); *Rodriguez v. Farrell*, 280 F.3d 1341, 1344 (11th Cir. 2002); *Brady v. Dill*, 187 F.3d 104, 106–07 (1st Cir. 1999); *Johnson v. Miller*, 680 F.2d 39, 40 (7th Cir. 1982); *Brown v. Patterson*, 823 F.2d 167, 168–69 (7th Cir. 1987); *Blackwell v. Barton*, 34 F.3d 298, 300 n.1 (5th Cir. 1994).

resisting arrest or attempting to evade arrest. . . ." *Pollreis*, 9 F.4th at 747 (quoting *Graham*, 490 U.S. at 396).

### C. *Monell* Claims

In *Monell*, the Supreme Court held that although § 1983 refers to violations of constitutional rights by any "person" acting under color of state law, a plaintiff can bring a suit against a municipality when an official policy or custom was the moving force for the alleged violation. 436 U.S. at 690–91; *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "Under a *Monell* claim, Section 1983 liability may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Smithrud*, 746 F.3d at 397 n.4 (cleaned up). A plaintiff can show that a municipal policy caused the constitutional violation by demonstrating that the policy affirmatively sanctions unconstitutional actions. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390–91 (8th Cir. 2007). To show that a failure to train or supervise was the moving force behind a constitutional violation, the plaintiff must allege that the "municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 390.

If a court finds that a plaintiff has failed to adequately allege a constitutional violation by individual officers and dismisses such individual claims, a *Monell* claim necessarily fails as well. *E.g.*, *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020) ("'Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . liability.'") (quoting *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

II.     **Analysis**

   **A. Unreasonable Arrest**

   There is no dispute in this case that the Defendants had a facially valid arrest warrant for Darryl Billups. Nor do the parties dispute that the officers arrested Mr. Webb because they incorrectly believed he was Billups. Instead, the parties disagree about whether Plaintiff has adequately alleged facts showing that the officers' mistake was *reasonable* under the circumstances.

   Defendants argue that they made a reasonable mistake because Mr. Webb was in a place (out of his room) that they expected Mr. Billups to be, because of M.P.'s identification of Mr. Webb as Billups, and because Mr. Webb failed to tell them his identity when they questioned him before leaving the scene. They also argue that the officers acted reasonably when they left Mr. Webb handcuffed in the squad car for several minutes after they confirmed his identity and returned to Portland House. In response, Mr. Webb argues that the Defendants' mistake was unreasonable because: the information available to them indicated that Mr. Webb did not match the description of Mr. Billups and the officers failed to conduct a more thorough investigation that would have alerted them sooner to their error. Specifically, Mr. Webb asserts that the Defendants ignored obvious differences between the physical description of Billups and Webb's own appearance, including (1) a four-inch difference in height, (2) a significant disparity of weight, (3) the length of each man's hair, and (4) the absence of any gold or blonde dye on the left side of Mr. Billups' dreads. He argues that the officers should have asked Mr. Webb his name, looked more quickly at the ID they took from him, checked his driver's license against their database sooner, or asked

Mr. Jefferson earlier in the encounter if Mr. Webb was, in fact, Darryl Billups. And Plaintiff contends that the officers unreasonably relied on M.P.'s identification of Webb as Billups because M.P. was twenty feet away from Mr. Webb, Webb had his back turned, they were in the dark, and M.P. said that the man with dyed hair on the side of his head "should be Darryl."

The Court is thus faced with a straightforward question in considering whether Mr. Webb sufficiently alleges a constitutional claim of false arrest: was the officers' mistake a reasonable one? The Court concludes that it was.

Dispatch directed Officer Calhoun and Officer Bakken to Portland House to execute facially valid warrants for Darryl Billups and Deondre Jefferson. The call details in the record regarding the subjects of the warrants indicated that Mr. Billups was a Black male, twenty-three years old, standing 5'10" tall, and weighing 224 pounds. Officer Bakken and Officer Calhoun learned that Jefferson and Billups had been known to carry weapons, and as they stood outside, Officer Bakken saw people moving around inside Portland House. When they spoke with M.P., a Portland House staff member who knew Billups and Jefferson, he told the officers that both targets of the warrant were inside the house, and that they had been out of their room, in violation of house rules. M.P. did not say what Billups or Jefferson was wearing, but he said that both had "dreads." He added the detail that "Darryl [Billups] has like, color on one side, like gold color on one side of his braids." Officers Cheng and Lange arrived on the scene and Officers Calhoun and Bakken filled them in about the warrants for Jefferson and Billups, relayed the concern about the possible presence of weapons, and shared the information they learned from M.P. So before they

entered Portland House, the officers had a physical description of Billups, and they had information reasonably indicating that they would encounter Billups and Jefferson out of their room.

After entering the residence, the officers very quickly encountered Mr. Jefferson— out of his room as M.P. had said—asked him his name, and placed him under arrest. At that point, they had one out of the two men in custody. Within seconds of that encounter, Officer Cheng and Officer Lange saw Mr. Webb. Although Webb does not perfectly match the description they received for Billups in the call details reflected in the record, he was close in age, the same race, within approximately 60 pounds, and he wore his hair in a style that could reasonably accord with M.P.'s description that Billups had "dreads."[7] Although they did not ask Webb to identify himself, having just arrested Jefferson, the officers could reasonably infer from the situation facing them that the second person they encountered was Billups. Webb was a male, outside of his room, whose physical appearance was within reasonable bounds of the description they had of Billups.

After Officers Cheng and Lange placed Mr. Webb in handcuffs, they led him outside the front of the residence where the other officers were holding Mr. Jefferson. Once outside, they did not simply take Mr. Webb immediately to a squad vehicle. Instead, they

---

[7] Defendants suggest that because people can change their hairstyles, the Court should disregard the fact that Mr. Webb did not have gold or blond dye on one side of his dreads as M.P. suggested. The Court disagrees that this reasoning would support dismissal here. It would not be a reasonable inference in favor of the nonmoving party to hypothesize that Billups had altered the appearance of his hair in the time between M.P. telling the officers about his appearance and the officers encountering Webb inside the house. Nevertheless, considering the totality of the circumstances, the Court finds that the absence of that detail in Webb's appearance did not make the arrest objectively unreasonable.

17

asked M.P. if the men they had arrested were the two men for whom they had warrants. Officer Lange or Officer Bakken shined a flashlight on Mr. Webb's face as they asked M.P. to make an identification. M.P. agreed that the officers had "both of them." Although Mr. Webb is correct that M.P. brought up Mr. Billups's dyed hair again during this exchange, it did not stop M.P. from making a positive identification. The officers could reasonably rely on that identification from a staff member of Portland House who was personally familiar with Billups.

Next, the officers took Mr. Webb's identification, and shortly after placing it in a manila envelope in the back of a squad car, Officer Bakken retrieved it so Officer Calhoun could review it. Officer Calhoun did not ignore the ID—he asked Mr. Webb about it prior to leaving the scene. Officer Calhoun saw that the name on the ID wasn't Darryl Billups, so he asked Mr. Webb "who's Robert Webb?" Rather than tell the Defendants that he was, in fact, Robert Webb, Mr. Webb said that he had been "doing business" as Robert Webb and that he had been known as Robert Webb. Officer Calhoun asked what Mr. Webb meant by those answers, and Mr. Webb provided no greater clarity on the subject. These answers reasonably could have conveyed that the man they arrested was Darryl Billups and that he was being evasive about a driver's license in his possession bearing a different name. *See Hill v. California*, 401 U.S. at 803 (observing that officers did not act unreasonably in arresting Miller, who produced ID with his own name, when officers had a warrant for Hill because "aliases and false identifications are not uncommon"). It was not objectively unreasonable, at that point, for the officers to continue to believe they arrested the man they were after.

18

Between eight and nine minutes after that discussion, the officers had driven a short distance away from Portland House, and Officer Calhoun began discussing the nature of the warrants the officers had just executed. At that point, he learned that nobody in the back seat was named "Darryl." He asked Mr. Webb "what's your name?", and at this point Mr. Webb identified himself as "Rob" and said "you have my ID." Officer Calhoun checked Mr. Webb's driver's license in the squad computer and discovered the mistake. They told Mr. Webb that they would take him back to Portland House, turned around, and arrived back at the residence within five minutes. But prior to Mr. Webb's definitive statements that he is Robert Webb, the totality of the circumstances facing the officers did not make their mistake of him for Billups unreasonable.

Mr. Webb argues that the Court should find otherwise, relying on *Bell v. Neukirch*, 979 F.3d 594 (8th Cir. 2020). But *Bell* is distinguishable. Unlike here, *Bell* is not a case in which the officers had a facially valid arrest warrant for an individual they had never seen in person. Rather, *Bell* considered whether there was probable cause for an arresting officer to determine that Mr. Bell was the same person he had just observed fleeing. *Id.* at 599–602. The officer obtained a significant array of details about the suspect's appearance. Based on his own observations, the officer first described the suspect as a "Black male. Dreads. Blue shorts[,]" then "elaborated: 'Juvenile black male, 17–18, about 5'10," skinny, blue shorts, white t-shirt, shoulder-length dreads. He was taking his shoes off. However, the *Bell* court explained that "Bell's appearance and that of the suspect differ[ed] markedly." *Id.* at 604. All that Bell had in common with the suspect was that they were "both black male juveniles wearing white t-shirts." *Id.* Moreover, Bell's clothing did not

match the suspect's clothing in myriad ways and the context in which the officers found him undermined any real suggestion that he was the suspect they were after. *Id.* (reasoning that it was unlikely Bell was the suspect because he would have had to just completed a mile running in warm weather, but was not sweating significantly, had just finished a call on his cell phone, and was not out of breath).

Mr. Webb emphasizes that the difference in height at issue in *Bell* is only 1-inch greater than the difference at issue here, and he asserts that the warrant information suggested Billups weighed only 164 pounds, more than 100 pounds less than Webb. He also contends that just as the officers in *Bell* failed to ask two other juveniles they detained at the scene about whether Mr. Bell was the suspect who had fled, *id.* at 601–02, the Defendants in this case did not initially ask Jefferson if Mr. Webb was, in fact, Billups.

But the similarities between this case and *Bell* fall short. The arresting officer in *Bell* had just personally seen the suspect fleeing, whereas there is no allegation that any of the Defendants in this case had ever laid eyes on Billups before they arrived at Portland House to execute the warrant. The arresting officer in *Bell* also provided a detailed description of the clothing the suspect was wearing moments earlier, and before taking Bell to jail, the arresting officer reviewed video footage of the fleeing suspect. The officer therefore had a first-hand knowledge of what the suspect looked like and the video depicted details consistent with the description he sent out over the radio prior to arresting Bell. The officers acted unreasonably because Bell bore little resemblance to those first-hand observations of the fleeing suspect. The Defendants in this case had no information about what Billups was

wearing before they arrested Mr. Webb, nor was the physical description they had as detailed as the one at issue in *Bell*.

Moreover, while Mr. Webb argues that the difference in weight at issue in this case is extraordinary, he overlooks the fact that the information contained in the call details for the warrant indicates that Billups weighed 214 or 224. It is more reasonable to mistake a person who weighs approximately 270 pounds for someone who at some point has weighed 225 pounds, though the Court acknowledges that the difference is not insignificant. Perhaps in a different fact pattern, one in which Mr. Webb provided less evasive answers to Officer Calhoun's questions of "who's Robert Webb" and M.P. had not made a positive identification, the differences in Mr. Webb's appearance from the description of Mr. Billups would have rendered a mistaken arrest less reasonable. But the test is based on all the circumstances, and there is no formula that says certain differences in physical characteristics necessarily render a mistake of fact unreasonable. *See Miller v. Eslinger*, No. 6:10-cv-1221-ORL-31, 2011 WL 4481260, at *4 (M.D. Fla. Sept. 27, 2011) (granting summary judgment on a false arrest claim in a case where there was a 40-pound difference in weight and a 3-inch difference in height between the plaintiff and the subject of the warrant where other details supported the reasonableness of the arresting officer's actions); *cf. Johnson v. Miller*, 680 F.2d 39, 41–42 (7th Cir. 1982) (finding no Fourth Amendment violation where officers mistakenly arrested a white female based on a facially valid warrant to arrest a woman of a different race).

Further, the portion of Exhibit A to the Defendants' Answer listing Mr. Billups's weight as 164 pounds is not part of the dispatch call details concerning the warrant, but a

separate part of the report. It appears just beneath a mugshot of Billups from September 2018 where the report summarizes information the Minneapolis Police Department compiled for Billups, Jefferson, *and* Mr. Webb. Defs.' Ans., Ex. A at 5. This makes it extremely unlikely that the Defendant officers saw either that photograph of Billups or the indication that he weighed 164 pounds before they entered Portland House to execute the warrant, and there is no allegation that they did. Admittedly, an official's awareness of such a substantial discrepancy in weight could support a determination that an arrest was unreasonable. *See Maxwell v. City of Indianapolis*, 998 F.2d 431, 434–35 (7th Cir. 1993) (finding summary judgment was not appropriate where plaintiff was 6 inches taller and almost 100 pounds heavier than the person to be arrested); *Taylor v. City of Michigan City*, No. 3:16-cv-836 JD, 2018 WL 6528172, at *5 (N.D. Ind. Dec. 11, 2018) (difference of 7-inches and 90 pounds between plaintiff and the person to be arrested supported finding that mistaken arrest was not reasonable). But given that the description of Billups's weight being 164 pounds was from information gathered three years before the incident at issue here, and the fact that a person's weight can vary significantly over time, the difference would have only been one factor to consider in the reasonableness of the mistake. *Rodriguez v. Farrell*, 280 F.3d 1341, 1348 n.14 (11th Cir. 2002) (observing that physical characteristics such as "weight are all easily variable, especially over six years").

Mr. Webb's remaining arguments primarily challenge the sufficiency of the Defendants' investigation. To be sure, Mr. Webb raises valid concerns about the fact that the Defendant officers arrested an innocent person whose physical characteristics do not exactly match the description of the subject of the warrant. The Court appreciates the

frustration that Mr. Webb feels at having been subjected to an arrest based on a misidentification that might have been avoided if the officers had been more careful about their identification procedures. But "[t]he law does not require law enforcement officers to conduct a perfect investigation to avoid suit for false arrest." *Joseph v. Allen,* 712 F.3d 1222, 1228 (8th Cir. 2013).[8]

More importantly, Mr. Webb's argument overlooks key aspects of the investigation the officers did conduct. They sought and obtained a description of Billups and Jefferson from M.P., and M.P. expressed familiarity with both men. They also learned that both Billups and Jefferson were inside the house and outside of their room. After the officers placed Webb in handcuffs and led him out of the residence, they didn't cease their investigation, but asked M.P. to confirm that Webb and Jefferson were Billups and Jefferson. Because it was dark, they shined a flashlight on Mr. Webb's face to help with the identification, and M.P. twice agreed that they had the man they intended to arrest. Later, in the squad vehicle, when Officer Calhoun saw that Webb's ID had a different name, he did not ignore that detail; rather, he asked "who's Robert Webb." Mr. Webb's responses to such questions and requests for clarification of what Mr. Webb meant by those answers, did not clearly indicate that Plaintiff definitively claimed to be Robert Webb. The

---

[8] In his opposition, Plaintiff cites *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) for the proposition that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* at 650. But in *Hill v. Scott*, the Eighth Circuit distinguished *Kuehl* because "the officer was investigating a possible crime after the fact and based his assessment of probable cause for the arrest on his shoddy investigation." 349 F.3d 1072. *Kuehl* does not suggest that officers executing a facially valid warrant must be perfect.

investigation into Mr. Webb's identity did not stop there. When Officer Calhoun became aware that Jefferson and Mr. Webb claimed there was no one named "Darryl" in the squad vehicle, and Webb said his name is "Rob," Calhoun ran Webb's ID through the computer and determined they had taken the wrong person into custody.

The investigation wasn't perfect, and had the Defendants asked certain questions of M.P. or Mr. Webb sooner or checked Mr. Webb's identification in the computer earlier in the process, they might have discovered more quickly that Webb was not Billups. But that is clear through the lens of hindsight and "[a]lthough the Supreme Court has acknowledged the significant negative consequences of arrest, it has afforded police significant latitude to make mistakes of fact when arresting individuals on the basis of warrants." Wayne A. Logan & Andrew Guthrie Ferguson, *Policing Criminal Justice Data*, 101 Minn. L. Rev. 541, 577 (2016). Under the circumstances presented by the pleadings in this case, the Defendants' investigation did not make their mistake objectively unreasonable.

The Eighth Circuit's decision in *Hill v. Scott*, 349 F.3d 1068, 1073–74 (8th Cir. 2003) supports this conclusion. There, if the defendant officer had verified information with dispatch prior to telling other officers to arrest the plaintiff, he very well might have learned that the warrant he believed was for the plaintiff was in fact for a person who shared the plaintiff's first and last name, but had a different date of birth, different middle name, and was of a different race. *Id.* Nevertheless, the court emphasized that "further investigation would have cast doubt on whether [the plaintiff] was the subject of the warrant. But that is always the case where an arrestee denies being the subject of a facially valid warrant." *Id.* The same is true here.

In another case of mistaken identity, the Eighth Circuit found that an arresting officer made a reasonable mistake in arresting the plaintiff believing she was the subject of an active warrant that had been issued for the plaintiff's sister-in-law, who had used the plaintiff's name as an alias. *Young v. City of Little Rock*, 249 F.3d 730, 732, 734 (8th Cir. 2001) (affirming district court's finding that plaintiff failed to state a claim against the arresting officer and the dispatcher). In *Young*, although further investigation or more careful review of the information the officers had might have revealed their mistake, the court found the officers did not act unreasonably in proceeding as they did. *Id.* at 734. In particular, the court found that the dispatcher's mistake in failing to convey more complete information about the target of the arrest warrant "was occasioned . . . by the press of business and by the speed with which officers in [her] position were required to act." *Id.* These same observations undermine Mr. Webb's argument that the officers in this case violated his Fourth Amendment rights by not conducting a more thorough investigation.

In sum, based on the totality of the circumstances, the Court finds that Defendants' arrest of Mr. Webb was based on a reasonable mistake of fact and, therefore, Mr. Webb fails to state a claim that he was unreasonably seized in violation of his Fourth Amendment rights based on his arrest.[9]

---

[9] Because Mr. Webb fails to state a plausible claim that his arrest was the result of an unreasonable mistake of fact, the Court does not address the individual Defendants' argument that the law did not clearly establish that their actions were unconstitutional.

### B.  Continued Detention

In his Complaint, Mr. Webb asserts that after the officers drove him back to Portland

House, "they still did not free [him]. Instead, they went inside and, upon information and

belief, spoke to the staff and searched for Mr. Billups for approximately 15 minutes."

Compl. ¶ 17. His false arrest claim asserts that the officers unreasonably "held Plaintiff

without probable cause or legal justification." *Id.* ¶ 35.[10]

Defendants argue that Mr. Webb fails to state a claim that his Fourth Amendment

rights were violated during the time Officers Calhoun and Bakken left him in their squad

vehicle to go back into Portland House to search for Billups, suggesting that this continued

detention was justified because releasing Webb might have allowed Billups to escape and

could have placed Webb in danger. Defs.' Mem. at 16–19 (relying on *Wright v. United

States*, 813 F.3d 689, 697 (8th Cir. 2015)). Aside from a passing reference to being "left

handcuffed in the squad car while [Defendants] checked Portland House to see if

Mr. Billups was still there," Pl.'s Opp'n at 7, Mr. Webb does not respond to the caselaw

cited by Defendants in support of this argument and makes no argument that the decision

by Officers Calhoun and Bakken to leave him in the vehicle was an independent violation

of his constitutional rights from his mistaken arrest. The Court construes Mr. Webb's

---

[10] Mr. Webb's complaint also asserts that he was "held for approximately 3 hours." Compl. ¶ 33. However, the Court notes that the video footage contradicts that allegation, as it shows that the entire incident lasted less than half an hour, and the portion of the encounter following the return to Portland House lasted approximately five minutes. Mr. Webb does not repeat the 3-hour detention assertion in his opposition to the Defendants' motion.

failure to respond to these arguments as a concession that his continued detention in the squad vehicle during this five-minute period did not violate his constitutional rights.[11]

The Court notes that Defendants have also argued that Mr. Webb's status as a parolee at the time of his arrest and his accompanying diminished expectation of privacy undermine any claim that he was unreasonably seized during the time that the officers left him in the squad vehicle while they briefly reentered Portland House to search for Mr. Billups because Mr. Webb. Defs.' Mem. 19–21. But Defendants cite no case suggesting that parolees may be arrested without probable cause, nor any case holding that government officials may subject a parolee to prolonged detention even after they have determined the parolee should be released simply because of parolee status. In any event, the Court need not address this argument because it finds Mr. Webb has failed to state a claim upon which relief may be granted.

For the foregoing reasons, the Court dismisses Mr. Webb's Fourth Amendment seizure claim in Count 1 of the Complaint to the extent he alleges that his arrest was unreasonable.

---

[11] In *Baker v. McCollan*, where the plaintiff was mistakenly arrested on a facially valid warrant and detained for three days over the New Year's holiday before he was eventually released, the Court held that his ongoing detention despite his protests that he was innocent did not violate his Fourth Amendment rights, but indicated that after a certain passage of time, continued detention in the face of such protests could violate the Fourteenth Amendment's Due Process Clause. 443 U.S. 137, 144–45 (1979). Mr. Webb has not alleged that his continued detention in this case violated his right to due process.

### C. Excessive Force Claim

The Court also finds that Mr. Webb fails to state a claim of excessive force. In Count 1 of the Complaint he alleges that Defendants engaged in excessive force when effecting his arrest because they pointed weapons at him and placed him in handcuffs. Compl. ¶ 35. In support of their Rule 12 motion, Defendants argued that under *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) and given the circumstances of this case, it was not unreasonable for the officers to briefly point their weapons at Mr. Webb when they effected his arrest. Defs.' Mem. 21–24. In response, Mr. Webb argues that the Defendants' "use of force against Plaintiff violated the Constitution for the same reason that their arrest and continued detention violated the Constitution: Plaintiff obviously did not match the description of Mr. Billups." Pl.'s Opp'n 16. Further, he asserts that "just as it was unreasonable to arrest him, it was unreasonable and unconstitutional to effectuate his arrest and continued detention through the use of force." *Id.* Mr. Webb does not argue that the officers in this case used force that was excessive because of the specific manner in which it was applied.

Given Mr. Webb's position that the officers' use of any force was unreasonable because the arrest itself was unreasonable, the Court finds that it need not address the applicability of *Pollreis* to the facts here. It is true that courts have recognized the use of any level of force to effectuate an unreasonable arrest would be excessive. *E.g.*, *Smith v. Appledorn*, No. 11-cv-2966 (JNE/SER), 2013 WL 451320, at *3 (D. Minn. Feb. 6, 2013) ("If Appledorn's seizure of Smith was unreasonable, any force used in the course of the seizure would also have been unreasonable."). Because Mr. Webb's complaint fails to state

a claim that he was subjected to an unreasonable arrest for the reasons explained above, the Court finds that he has not sufficiently alleged that the officers' use of force was necessarily unreasonable. Therefore, the Court dismisses Mr. Webb's claim that the officers used excessive force.

### D. *Monell* Claim

Mr. Webb argues that he has sufficiently pled a *Monell* claim. He asserts that a custom of racially discriminatory police practices and failure to provide sufficient training to officers concerning implicit bias were the motivating force that caused a violation of his Fourth Amendment rights. He asserts that such a custom is amply demonstrated in reports issued by the Minnesota Department of Human Rights in August 2022 and the Department of Justice in June 2023. Because the Court finds that Mr. Webb fails to state a claim that Defendants violated his constitutional rights, he fails to state an actionable *Monell* claim. *Stockley*, 963 F.3d at 823.

Accordingly, the Court dismisses Count 2 of the Complaint.

### E. Supplemental State Law Claims

Although Defendants argue that Mr. Webb fails to state any claim under state law because they are entitled to official immunity, the Court declines to reach the merits of this issue. District Courts have supplemental jurisdiction over state law claims when they are "so related to" the federal law claims in that action. 28 U.S.C. § 1331, 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a state law claim when the court dismisses the accompanying federal claims. *Id.* § 1367(c)(3). Here, because the Court dismisses Mr. Webb's § 1983 claims, and there are no other federal law claims

remaining, the Court declines to exercise jurisdiction over his state law claims. Therefore, the Court dismisses the false arrest and false imprisonment claims without prejudice. The Court also declines to exercise supplemental jurisdiction over Counts 4 and 5 of the Complaint, which allege violations of the MGDPA. Those claims are likewise dismissed without prejudice.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1. Defendants' Motion for Judgment on the Pleadings is **GRANTED IN PART** and **DENIED IN PART**.

2. Plaintiff's 42 U.S.C. § 1983 claims against the individual officers in Count 1 of the Complaint, and Plaintiff's *Monell* claim against the City of Minneapolis in Count 2 of the Complaint, are **DISMISSED WITH PREJUDICE**.

3. Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise jurisdiction over Plaintiff's state law claims in Counts 3, 4, and 5 of the Complaint. Those claims are **DISMISSED WITHOUT PREJUDICE**. The Court therefore denies Defendants' motion to the extent they seek an order dismissing these state law claims with prejudice.

**Let Judgment be entered accordingly.**

Date: September 9, 2024                    *s/Katherine Menendez*
                                          Katherine Menendez
                                          United States District Judge